Good morning. May it please the court, my name is Blackwell Shelley. I represent the case comes before the court following dismissal at the trial court level of counts, well half of count two and counts three and four of the complaint, and then later on summary judgment dismissal of count one and the other remaining part of count two. Because of, we're doing this de novo, but because there are different sources of the facts upon which we rely, I is based on the allegations in the complaint, and then move forward to the motion for summary judgment. But all of these factual allegations or factual sources kind of come before or after one pivotal moment in the story of this case, which is when Ms. David's counsel sent a letter to her employer announcing that it appeared that she had colorable claims under the ADA and under the ADEA. Is this the October 3rd letter? It's, yes ma'am, it's the, well actually no ma'am, it's the September 19th letter. Okay. In which counsel puts Winchester Medical Center on notice of these colorable claims. In that letter she talked about an October 3rd resignation day? Yes ma'am. Is there anywhere in the complaint where you actually accepted this letter? But she submitted her... I didn't ask you that. I asked you if she accepted it, if they said yes. Well I think you can infer from the complaint that... If David answers no then, is that right? Well no your honor. Well it's either yes or no. Well on September 3rd she gave her written notice to Winchester Medical Center, that's alleged in the complaint. And she puts in it that this is for an October 3rd resignation day. To be effective October 3rd. Right. And is there anywhere in the record where the medical center said yes, that's right? Well once she had resigned your honor, that was not something that she could rescind. The question, if you could answer, I have a similar question, so rather than repeat it, if you could just respond to Judge Moss. Well Judge, she gave a written notice of resignation on September 3rd, says this is effective October 3rd. Following that, she received a written document from Winchester Medical Center saying this is your separation agreement. Rather than you continuing until October 3rd for your resignation, we're going to give you two months of severance pay rather than one. Uh huh. That's alleged in the complaint. Okay. And I think the inference from that is that yes, they accepted her resignation. Isn't there a danger here that a company which is trying, if both parties to negotiations do have every right to negotiate for terms most if your client unilaterally withdraws from severance negotiations because many of the other cases involved instances where the company had withdrawn from the negotiations, but there's a danger here if both parties, because they have every right to do, are just negotiating for their most advantageous terms and then one party withdraws and your client withdraws and then the other company says fine, you've withdrawn. I mean, is that going to be retaliation? It would seem to me to cast a pall over a lot of severance packages. Well, it might Judge, but that's not the situation here. Here we have a status quo prior to the letter from There have been a lot of shifting dates and there's some inconsistency. In some statements, David notes that she resigned September 3rd. That is the date on which she gave the written notice. The severance and release agreement states that she was terminated September 3rd, but had 21 days within which to consider the agreement. Yes, Judge, but the separation agreement is something that's added to the record by the defendant appellee. It was not something drafted by Ms. David. I'm not quite sure what the relevance of that. I'm just trying to get the dates because obviously she resigned September 3rd. We're straight on that. It's not October 3rd. But in the October 3rd letter. No, she says that that's her resignation date. Yes, Judge, the written notice is September 3rd, but to the effect of October 3rd. And it may help clarify. But the clarification is necessary because of some of the inconsistencies in her statements. I'm not sure what the inconsistencies are, Your Honor. She asserts that she was retroactively terminated and her resignation was backdated. Not exactly, Judge. What she says is that. Those were actual quotes. After her counsel sent the letter and after Winchester Medical Center responded saying, you've rejected our offer. Nothing further will go on. Your separation from employment will be What Ms. David has alleged is that she had resigned to be effective. Yeah, but she tried to say that they've accepted her, but they didn't. That was her offer. Not accepted. What she has alleged, Judge Mons, is that she resigned on September 3rd with this 30 day to comply with PTO provisions in the policy. Everybody understood that at the time. She was about to go in for heart catheterization. She wanted to be covered under health insurance until October 3rd. That was understood later. What is your evidence for the fact that it was understood? You would have to infer it from the allegations of the complaint, Your Honor. Because the severance and release agreement says she was terminated September 3rd, but she had a 21 day window. So that would seem to be a pretty effective reputation of the suggestion that Winchester accepted October 3rd as an operative date. Well, Your Honor, perhaps it helps to look at it this way. As alleged in the complaint, there was an oral conversation among Ms. David, Kathy Cagarees, and Ann Whiteside. During that oral conversation, they said, if you resign, we will give you a separation agreement. Ms. David complied. She said, here is my written notice of resignation. Then the conversation was, no, don't make it effective October 3rd. Make it effective immediately, and we'll give you two months of severance pay. Why is that wrong? She's a NatWell employee, right? She is. And we're making a whole lot of money. Yes. So, I just, I mean, this isn't an unsophisticated person. I just don't understand that. She can't change, she can't dictate the terms on which she's leaving. Unless, if they agreed to it, that would be fine. But they didn't. They requested that she resign, and she resigned. But they had a right to fire her, right? They could have fired her. Okay. But they didn't. I understand that. They said, instead, you can resign. She said, I'm resigning. But what if she had said, she'd offered her resignation letter on September 3rd, and said, but this will be effective December 3rd. Of next year. Yes. Well, what about it? Why would it be, couldn't possibly think that that was reasonable. Confer, as you would say, that that's reasonable. She could resign during that interim period between September 3rd, 2014, and December 3rd, 2015. And keep her benefits for the next year. But she's at will. Exactly. She could have resigned, and they could have the next day said, you're fired. But that would have changed it. I don't understand how retaliation gets into this. It seems to me it's just a situation where you have a highly unsatisfactory employee, and negotiating over severance, and an employer didn't like the terms, and understandably didn't like the terms. So this seems to me to be just sort of the kind of thing that, you know, routinely happens all the time. And the law accords a certain protection to settlement negotiations and to settlement agreements. And once you have, you know, negotiation over severance is a form of settlement. And it just can't be that every time an employer doesn't like the terms that the employee proposes and declines to accept those terms, that there's something retaliatory about it. Now, it's conceivable that facts might emerge that would make it retaliatory. And if the employer said, well, you know, she's filed a complaint. I've just learned that she's filed a complaint. We're taking the severance agreement completely off the table. We're not going to give her anything. That would be retaliation. But I don't think that that, as I can see it, I don't think you have that kind of precipitating cause where the employee is engaged in some form of protected activity and the employer uses that as the pretext for terminating severance negotiations. I just don't see that here. I'm not sure I see the protected activity, and I'm not sure I see the malign intent on the employer's part. But what I do see, based on this record, are simply settlement negotiations or severance negotiations that broke down. Big deal. I mean, negotiations break down all the time because the parties can't agree to terms. And unless you have something more. What is more here, George? I've looked at this record pretty carefully, and I don't see it. I must say it's a little rich that you're bringing a retaliation claim, which is every right to do. But throughout, when you look at the record, the person who's retaliatory is the plaintiff. She's throwing things at people and cursing people whenever they question her judgment and everything. So I say, you know, it's a little rich to say that it's just the irony of it all that she's claiming on the basis of a thin record that she's being retaliated against, where over the course of her employment, her relationship with her subordinates was to retaliate against anyone who rubbed her the wrong way or questioned her judgment or questioned her policies. It's just a little bit too much. I don't exclude the possibilities that breaking off severance negotiations or withdrawing a severance negotiation could be retaliatory. If there was protected activity, and if the action at the negotiating table was precipitated by exacting revenge for protected activity, but I don't see it. I don't see that here. The argument that I thought you were going to make when I started your brief is that the payment of right was withdrawn because she raised the possibility of pursuing colorable allegations. I believe that is our argument. But that could only work if she were otherwise entitled to them. You acknowledge in the complaint that she isn't, and since she wasn't otherwise entitled to them, you can't say that the denial of them, and she recognizes that there are provisos to the payment of personal time off, provided that the employee had been employed for previous six months and accrued time off and given appropriate notice of resignation. I mean, it was a discretion. You acknowledge in the brief that it was a discretionary benefit to which she was not automatically entitled. It is, Your Honor. A discretionary benefit that no employee is automatically entitled to unless they do those things. Correct. And so since she was not otherwise entitled to it, there's no allegation that it. But we allege in the complaint, Your Honor, that she became entitled when she gave her notice of resignation. But that's why I kept asking you about it, because she can't determine that, that she has to have agreement with her employer with respect to make that be an entitlement. Because she's setting up in that letter the terms on which she would resign. And I understand how she interprets this. But there's no indication in this record, and you haven't cited any indication to me yet, that the employer agreed with how she interpreted her rights. Well, Your Honor, I suppose you could infer from the agreement that is made a part of the record that that became incorporated into the deal. She says, I resign September 3rd to be effective October 3rd. That is in accordance with the policy which would entitle her to her accrued paid time off. No. No. Because she only had 21 days, as I recall. Your Honor, the policy says the employee has to give 30 days advance notice. And that was the basis for the 30 days in her notice. All right. Thank you, sir. So I think you can glean from this that the thing that at least seems to me to be the most viable, the most troubling claim that Ms. David has, is this retaliation claim. So maybe you can address that for sure. Yes, Your Honor. Andrew Barker on behalf of the appellee of the defendant hospital. To answer Judge Duncan's question about getting the date straight, the termination occurred on September 3rd, 2014. That's the allegation in the complaint. That Ms. David's supervisor, the Vice President of Nursing, Ann Whiteside, and the Human Resources Liaison, Kathy Cagorize, called her in for a meeting following their investigation and told her, we are giving you the option of resigning rather than being terminated. The allegation in the complaint is, she was also told you have to resign immediately. The allegation in the complaint is, she was also told you have to give appropriate notice of resignation. And what she instead submitted was a resignation to be effective 30 days later, October 3rd. Nevertheless, they gave her the written severance agreement that had been prepared. And all of this was contingent on her entering into the severance and release agreement, which the case law states we should encourage these types of resolutions, provided they're not discriminatorily applied. And the severance and release agreement was made part of the record. It was considered by Judge Urbanski on the 12B6. It specifically tied the paid time off benefit to entering that release agreement. So the severance, the PTO, they were both part of the same agreement. And that was given to her the same day. What same day? The same day, September 3rd, Your Honor. And that segues directly into Judge Wilkinson's concern that there was no protected activity here. Nothing happened between informing her that she was being terminated unless she agreed to resign and accept the written agreement, and counsel's subsequent letter two weeks later that's held up as the protected activity. Well, the protected activity is, they would allege, the notifying the hospital that she had claims under Title VII, the ADA, and the ADEA. Correct. That's the protected activity that's alleged. The problem from a legal perspective is the allegation of harm, the adverse action is withdrawal of paid time off. Well, that was why I was getting to, I'm sorry, you were getting there, I'm sorry. I was, Your Honor. No protected activity occurred because the written severance agreement that had been provided to her the day of that meeting said, paid time off and severance are contingent on you signing this agreement. So she already knew. She already knew. And the payments were discretionary anyway. Exactly right, Your Honor. So there was no protected activity, there was no adverse action from her decision. She already knew. She alleges that there was this sex discrimination against her. That preceded any of these letters of negotiation, right? I'm sorry, go ahead. She knew about the paid time off, the conditions for the paid time off. Again, I'm jumping in here, but I think that's what you mean. You mean she knew about it because she knew that as an employee? No. Or because of this document you gave her? The September, it was accompanying the September 3rd. It was given to her on September 3rd. Yes. You see, I think her claim is that the employer treated her this way because she had alleged sex discrimination. And she had. That's the retaliation. That's the asserted protected activity. And the retaliation is everything that happens after that. And she had full discovery and summary judgment on the retaliation piece of her Title VII sex discrimination claim. And my answer would be both and. That she knew both that she had to give appropriate notice of resignation based on the allegations in her complaint. And appropriate notice was immediate resignation, not resignation to be effective in 30 days in order to get PTO. And she also knew that from the written severance agreement that was provided to her that very same day, in sections 2.1 of the severance agreement, it ties PTO and any severance benefit to her entering that release. All of that occurred before her attorney sent the letter. And that letter is the piece that's alleged in the complaint under the ADA. There's retaliation because of that. Correct, Your Honor. I got it. It gets into a principle that this court addressed in the ERISA context. We talked about this case, Stiltner v. Beretta USA Corporation, from this court in 1996. It said employers who seek to help their employees by providing gratuitous benefits risk a lawsuit if they revoke the benefits. Employers may be inclined to turn a cold shoulder on those employees. And therefore, in the context of that case, the withdrawal of voluntary benefits did not violate ERISA. Now, in this case, we go a step further because Ms. David is the party who affirmatively rejected the offer that was made to her and declined to enter into that. I think her claim, I think it is, is that in her resignation letter she was asserting all these rights and that somehow we can infer that Winchester accepted her terms. I would disagree. I understand that's her argument, but we're not required to make unreasonable inferences. And when that severance agreement is provided to her, before this protected activity, particularly it's consistent with the allegations in her complaint that she had to give notice of resignation that would be accepted by the employer in order to get these benefits. She was then provided with a written document that said, you only get PTO, you only get severance if you agree to these terms. And she did not do that. And so the more reasonable inference is to contradict the argument that's being made and to say that, no, you couldn't pick and choose which benefit you thought you were entitled to or not. There was no reason for the hospital to say, okay, we'll give you your PTO because you resigned today, but we're not going to have your claims released. There was no benefit to them in that process. And so it's an unreasonable inference, and I would submit inconsistent with the allegations in the complaint, to say that PTO and severance, that she got PTO simply because she resigned to be effective in 30 days. And like all cases, we're guided by precedent. And when we are delving into these discussions, and the complaint, I believe it was paragraph 5 of the complaint, specifically alleged that these were settlement, this was a settlement offer that had been made, and there were negotiations taking place. We're getting into parsing things that courts shouldn't parse. We're also getting into things from an employment perspective that creates the super personnel council that this court has consistently said it does not exist in that capacity. And the district court correctly applied those principles in summary judgment, that Jimenez v. Mary Washington College, the court reviews professional employment decisions with great trepidation. It does not sit as a personnel council. Hawkins v. PepsiCo, I would submit, is the most analogous situation to our case. The court held the court's sole concern is whether the reason for which the defendant discharged the plaintiff was discriminatory, not whether it was wise, fair, or even correct. So those are the standards the district court applied on summary judgment. And our position would be that if we're going to open the lid on settlement discussions, and open the lid on can you unilaterally accept some benefits and not others, and what was said and what wasn't said, particularly when it's not consistent with the allegations in the complaint, not consistent with the extrinsic documents the court reviewed on the 12b6, we then put ourselves in a situation where we are that personnel department that the court has said it is not supposed to be. Put yourself in a situation where one party, in this case the employer, is obliged to accept the most favorable terms that the negotiating party, the employee, puts forward. Because if you accept anything less, it's in some way retaliatory. That is ultimately where you could go with that. That just prompts a concern on my part, because I think that there ought to be some freedom and some latitude on the part of both parties to a settlement agreement to say no, this particular term goes too far without a sword hanging over you to say that if we don't accept the most favorable terms, it's in some sense retaliatory. That's a concern we share, Your Honor, and it would be our position that there was no retaliatory action, there was no adverse action. We pointed out in our brief that the district court also considered several e-mails between counsel for plaintiff and defendant, even subsequent to the date of this rejection, that were not made part of the record. But he had that context as well. The point that I would like to make with respect to the one case that the appellant really relies on, Hacken v. Fannie Mae from the D.C. circuit, and just to point out the one factor in that case that's distinguishable here. In that case, the severance offer was left open for 30 days. The plaintiff then filed an EEOC charge, and the employer took it back the same day. So that was not a case where we simply had an offer of severance, a complaint, and then it was withdrawn. We had additional protected activity in the form of an EEOC charge. That does not exist here. There was no protected activity between her receiving that severance and release agreement and her decision to reject it and to offer up additional negotiations, which is what that letter says. The allegation is her termination was backdated. The letter from her counsel seven times recognized that she had already been terminated. The allegation is that severance and PTO were withdrawn, but they were contingent on her signing the release. And those were the facts before the district court. I'm happy to address the summary judgment decision. As the court noted, this was a very unsatisfactory employee. Unless the court has any questions, I would rely on our brief. One thing that seems to me is that underlying all these claims is the question of causation, both on the merits and elsewhere. And causation may not be as compartmentalized. It seems to me that the company's actions really throughout were, in their different phases, were motivated by the employment record and essentially by this, I guess it was the Gardner-Schmidt allegations, which led to the investigation. As Judge Urbanski pointed out, this was, as Whiteside said, this was the worst example of worse. David's behavior was the worst she had seen in 30-plus years of employment. And it seems to me that that was the catalyst for the company's actions here. It carried over from one phase of this to another. It's remarkable when somebody says, after an investigation, which was brought on by the employees who had been treated in this fashion, said this is the worst I've ever seen in 30 years. And that was really the underlying motivator for all that happened here. It was. And those discussions that we've been talking about on 12b-6, I understand were not subject to the summary judgment decision, but they are backlit at this point by that record. And I would also note that Ms. David's supervisor was a female. The two human resources personnel who were involved in this process were both female. Her seven peer directors were female. Thirteen of the 14 employees that were interviewed during the investigation were female. So there's no hint of any gender-based animus here. And the final point I would leave the Court with is the Supreme Court's decision in Nassar v. Texas Southwestern Medical Center, where it talks about but-for causation and retaliation claims. And the Court said, quote, retaliation is being filed with ever-increasing frequency. And it gave the example of the employee who knows she is about to be fired and makes a complaint on the way out the door. And my read of that case is these claims need to be viewed with a little bit of skepticism, particularly in this situation, which is even more tenuous. She wasn't just on the way out the door. She was already out the door. She had been terminated when the September letter from her counsel was sent. That's the alleged protected activity, and it just does not meet the law or the facts of this case. Thank you. Correct, Your Honor. Sure, there could be scenarios. The packing case from D.C. might be one of those. The complaint not only does not lock it down, it's also contradicted by the documents that the district court has sent. It is inconsistent. Thank you, Your Honor. There were a couple of points that I wanted to address. Both of them tie into this Paquin case that I had cited in the brief that Mr. Barger has just referenced. I think he's incorrect in his reading of Paquin when he says that the employer left the offer of severance open for 30 days. In fact, the employee's counsel wrote back to the company and rejected that offer. But negotiations continued. I think the rejection was that the employee's attorney wanted the employee to get more money. That would have operated as a rejection of a settlement offer. And, Your Honor, Judge Wilkinson, you noted some concern that if we start allowing these severance-related letters from attorneys to become protected conduct, then that will create a slippery slope that every time an employer rejects a counteroffer, it becomes retaliation. Paquin addresses that. That doesn't necessarily apply in every case. There would have to be some causal connection between the rejection of the settlement offer and the action the employer took. There would have to be some change in the status quo, which I believe we have alleged here. Finally, Judge, one thing that I would like to point out and I would like the court to give some consideration to is that it's not entirely pellucid that Ms. David was such an awful employee. All of these years that she worked there, 10 years almost, she had consistently received complaints from subordinate employees, complaints from peers. She went through coaching for every complaint that she got. But the record wasn't really looked into until after. Who were these two employees who raised concerns about her? David Gardner and Dawn Forte-Smith. She had discipline. That was the precipitating event for the investigation. And before that time, they hadn't really looked into what the record was. And then when they began to systematically look into it, there were examples of abusive, really badly abusive behavior toward those who were under her supervision. Again, the supervisor who conducted the investigation, to the people who were interviewed, they were female. I'm not saying that's dispositive, but just example after example. But, Your Honor, in the record, Ms. Whiteside said before any of this investigation ever started, Mrs. Gardner, David Gardner's wife, had come to her and told her that he was paralyzed with fear by Mary David, but they never did anything until after she made her complaint. Well, there were two performance improvement plans. That's correct. Only one related to the relationship with employees. Well, there were two performance improvement plans. There was a patient safety event. There was a risk report filed by the security guard. And that's in addition to the investigation into the complaints by Smith and Gardner. But the hospital did nothing with respect to those other complaints until Ms. David said, I'm going to complain about Dr. Restrepo. And then two days later, this investigation started in which all of this stuff is dragged up. And the two people that were the subject of the investigation are two people that Ms. David had just disciplined. All right. Thank you, Mr. Shelly. Thank you, Judge. Appreciate it. Donna, did you have any further questions? We'll come down to recouncil and move into our last case.
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, Allyson K. Duncan